# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| KELLEY BENTON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | No. 12 C 3075 |
| ) | |
| ERIC K. SHINSEKI, Secretary, United ) | |
| States Department of Veterans Affairs, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Kelley Benton has sued Eric Shinseki, in his capacity as Secretary of the United States Department of Veterans Affairs, under the Rehabilitation Act of 1973, 29 U.S.C. § 794a. She alleges that the Department of Veterans Affairs (VA), her former employer, discriminated against her based upon her disability when she was denied the opportunity to attend a training conference. Benton further alleges that her supervisor created a hostile work environment based on her disability. Shinseki has moved for summary judgment on both claims. For the following reasons, the Court grants the motion.

## Background

Three decades before her employment began at the VA, Benton was diagnosed with sickle-cell thalassemia, a disease that disrupts the blood flow to her extremities and incapacitates her for variable periods of time. Benton says the sickle cell crises (episodes) that she experiences can last from an hour up to three weeks and can be

triggered by a host of events, including overexertion, rain, stress, moderate walking, shoveling snow, the common cold, swimming, and humidity.

In 2005, Benton began working as an information technology specialist for the VA in the agency's office in Tuscaloosa, Alabama. She transferred to the VA's Maywood, Illinois office in 2007. Benton was part of a team of five IT specialists who worked in different VA locations across the country. Their supervisor, Donald Kachman, worked out of his home in Battle Creek, Michigan.

Benton first told Kachman about her disability in August 2008, when she wrote him an e-mail informing him she had just been in the hospital with a sickle cell crisis. In November 2008, Benton had shoulder surgery related to her sickle cell condition. Because the surgery required Benton to take pain medication, Benton's doctor wrote a note to the VA requesting that she be allowed to work from home for two weeks after the surgery. The request was approved, and Benton ended up working from home for approximately one month.

Just over a year after Benton first informed Kachman about her condition, she made a formal request for an accommodation, specifically, to perform her duties from home on an indefinite basis. Benton's first request was returned for insufficient documentation; her second (this time with documentation) was denied. The denial, written by Kachman in December 2009, advised Benton that the ability to work at the office was essential:

> [t]he position you currently occupy is a full time position that, due to the functions and equipment necessary to perform all of the essential functions of your position, requires you to be physically located in the area/location you are currently assigned. This is essential in order for SD & Core to provide the services required to fulfill and meet the mission and goals of our Service.

Def.'s Ex. E at 11.

In an exchange of memos and e-mails, Benton challenged Kachman's decision, noting that she had worked from home without incident after her shoulder surgery. Kachman replied that Benton was "not required to perform some of the essential functions of your position" during her work-from-home period. *Id.* at 26, 29–31. Kachman provided a list of five job functions that he said required Benton's presence in the office. These included testing multiple configurations of machines, having "reliable network connectivity and a constant connection" for specific tasks, scanning machines on the VA network that were not accessible via virtual private network (VPN), working with staff on site in the Maywood facility, and having "[a]ccess to a multitude of equipment" with "the space, power, and network connectivity for each of those devices." *Id.* at 30–31. Kachman said later during his deposition that the ability of an employee in Benton's position to test machines is difficult when the employee is not directly on the network, and that it is important to be able to test solutions on a variety of equipment on site and to act quickly in doing so.

In a response to Kachman's memo, Benton did not dispute the existence of any of the duties Kachman mentioned or his statement that they could not be performed adequately from home. Instead, she argued that Kachman did not comprehend her disability, disputed that she had a pattern of absences, and stated that she was "able to do my job 100%." *Id.* at 36–38. She also said, "I understand that [Kachman] is saying that my job is not qualified to be a work from home job," and, "I want to reiterate that I understand that my job does not qualify as a work from home job." *Id.*

Kachman did offer Benton some accommodations. In response to Benton's

request for a private office at the Maywood facility, Kachman pointed to the office's compliance with health and safety standards and instead offered her a parking spot close to the building. Benton rejected this offer, stating that "all of my coworkers will notice that I'm parking in front and will ask me why." *Id.* at 38. Soon after that exchange, Kachman permitted Benton to forego a planned change in her hours to conform with those of other team members so that she would be able to submit blood to a testing lab before she came into work. On the other hand, Benton also resubmitted her work-from-home request, this time asking to do so two or three times a week or on an as-needed basis. Kachman denied this request.

In subsequent weeks and months, Benton and Kachman had several e-mail exchanges regarding Benton's performance, duties, and attendance at work. Topics included team conference calls Benton was required to join, her progress on various assignments, and her knowledge related to various tasks she was required to perform and "milestones" she was required to achieve. In another e-mail exchange, a coworker praised Benton for her contribution on a project, and Kachman responded by asking the coworker what Benton had done. Kachman's response was arguably worded in a way that suggested he doubted that Benton had actually contributed anything. The coworker responded with specifics, and Kachman did not respond.

During this time, in the first half of 2010, Kachman had taken notice of various work tasks that Benton was not completing, including "very basic tasks; building servers, manipulating group policies, and active directories." Def.'s Ex. B at 34. When Benton would have these issues, Kachman would tell her "that she needed to work on these problems herself rather than going to other employees." *Id.* at 35. In April 2010,

4

three months after denying Benton's request to work from home, Kachman sent Benton a memo entitled "Warning Notice of Unacceptable Performance/Opportunity to Improve."  Def.'s Ex. I.  The memo informed Benton that her performance "since early Nov 2009" had been "unacceptable" in three "critical elements" of her position.  *Id.* at 1.  Kachman noted multiple incidents in which Benton had performed poorly, such as failing to meet requirements in lab testing, failing to complete tasks without assistance, demonstrating lack of knowledge on specific projects, and including errors in submitted projects.  The memo informed Benton she would be placed on a ninety-day plan to improve performance.  The next month, Kachman sent Benton an e-mail asking about some of her apparent absences from the Maywood office.  Benton told Kachman his query was "ridiculous," that he was "obviously retaliating against me and trying to find anything you can," and that he was "creating a very hostile work environment" which was damaging her health.  Pl.'s Ex. 2 at 39–40.

In May 2010, Kachman e-mailed Benton to inform her that she could not attend an upcoming Microsoft training conference in New Orleans called TechEd.  Kachman's e-mail stated that he wanted to help her find online training instead of traveling to New Orleans, "to accommodate your training needs as well as your need for FMLA," referring to her recent request for time off under the Family and Medical Leave Act.  *Id.* at 29–30.  Kachman told Benton to cancel her hotel booking in New Orleans.  He provided the URL for a Microsoft website where she could pick online training courses to take.  "Please take a look and decide which courses would benefit your technical advancement," Kachman wrote.  "Once you have a list, we can review together and submit them to management."  *Id.*

Although Benton replied to Kachman's e-mail, apparently with an attachment listing the classes she wished to take, that list was not submitted as an exhibit by either party in this case. Benton never took the online courses, however. In an affidavit made after her disability retirement, Benton stated that she selected classes from the list Kachman sent out of fear that he "would have retaliated against me"; she also acknowledged that she had never completed the training. *See* Pl.'s Ex. 5 at 8.

Kachman explained to a VA investigator that he had denied Benton's travel to the conference because she "had advised me that her condition could flare up during air travel and cause her to have complications." Def.'s Ex. B at 24. In an internal investigation of the denial of training, Kachman told an investigator that "[t]he online training provided was directly from Microsoft and would have been similar to what she would have seen in the labs during the conference." Def.'s Ex. B at 24. Kachman also told the investigator that only one of his employees had gone to the New Orleans conference. During her deposition, Benton acknowledged that she was offered online training but argued she should have been able to attend the conference "[b]ecause I wanted to go. I should make that decision." Def.'s Ex. A at 66–67. Benton has offered no evidence, however, contradicting Kachman's statement that the online training was similar to what Benton would have gotten during the conference.

The next month, Benton took leave under the FMLA after she was hospitalized for a blood clot. She later took disability retirement and did not return to employment at the VA.

## Discussion

Summary judgment is appropriate if "there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On a motion for summary judgment, the Court must give "the non-moving party the benefit of conflicts in the evidence and reasonable inferences that could be drawn from it." *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 794 (7th Cir. 2013). "A genuine issue of material fact exists only if there is enough evidence that a reasonable jury could return a verdict in favor of the nonmoving party." *Peele v. Burch*, 722 F.3d 956, 958 (7th Cir. 2013).

Shinseki has moved for summary judgment on both of Benton's claims. On Benton's Rehabilitation Act discrimination claim, Shinseki argues that Benton was not qualified to perform the essential functions of her position and that Benton did not suffer an adverse employment action in being denied the opportunity to attend the New Orleans training conference. On Benton's hostile work environment claim, Shinseki contends that the cited behavior by Benton's supervisor did not rise to the severe or pervasive level required for a finding of a hostile environment, nor was it connected to her disability.

**1.     Disability discrimination claim[1]**

Although Benton sued Shinseki under the Rehabilitation Act, a discrimination claim under that law is evaluated under the same standards in the Seventh Circuit as a claim under the Americans with Disabilities Act (ADA). *Burks v. Wisc. Dep't of Transp.*, 464 F.3d 744, 756 n.12 (7th Cir. 2006). The Court thus will evaluate Benton's claim under ADA standards. To survive a motion for summary judgment, "an ADA plaintiff must identify a genuine issue of material fact as to whether (1) she is disabled; (2) she

---

[1] Benton has not asserted a claim of failure to accommodate arising from the VA's denials of her requests to work at home.

7

is able to perform the essential functions of the job either with or without reasonable accommodation; and (3) she suffered an adverse employment action because of her disability." *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 533 (7th Cir. 2013).

Shinseki does not dispute that Benton can prove that she is disabled. He contends, however, that Benton cannot show that she could perform the essential functions of her position without the accommodation of working from home, which Shinseki argues is not a reasonable accommodation. He further claims that Benton was not subject to an actionable adverse employment action.

### a. Essential Functions and Reasonable Accommodations

Much ink is spilled in the parties' arguments regarding Benton's discrimination claim on whether she " would have been able to perform the essential functions of her job with a reasonable accommodation," an element of her discrimination claim. *Basden v. Prof'l Transp., Inc.*, 714 F.3d 1034, 1037 (7th Cir. 2013). Shinseki's arguments focus on whether allowing Benton to work at home would have been a reasonable accommodation that would have permitted her to perform her job's essential functions.

This is a non-issue, in the Court's view. Given the narrowing of the claim to the denial of training, the question is whether, *at the time of the denial of training*, Benton was able to perform the essential functions of her job. A reasonable jury could so find; indeed, the question is not close. Benton was working at the office at the time (May 2010) and was performing her job's essential functions, at least based on her April 2010 performance review. The fact that she might not have been able to continue to work entirely from the office in the longer term is immaterial with regard to her narrowed discrimination claim, which focuses on a single incident.

8

### b. Adverse employment action

In her summary judgment response brief, Benton narrows her discrimination claim to a single alleged adverse employment action: Kachman's refusal to allow her to travel to the New Orleans TechEd training conference in 2010. Benton argues that the denial qualifies, without more, as actionable adverse action: "Plaintiff does not have to show that the denial of job training affected her compensation, benefits, hours worked, job title, or ability to advance to be an adverse action in the context of her ADA discrimination claim. . . . Under the ADA, if she was denied training, she has suffered an adverse job action." Pl.'s Mem. at 13.

The ADA lists the following areas in which employers may not discriminate against qualified individuals on the basis of their disabilities: "job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The Seventh Circuit has indicated that the express inclusion of "job training" among the subjects protected by the ADA relieves plaintiffs of the obligation to show that a denial of job training was materially adverse. *See Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 574–77 (7th Cir. 2001) (applying rule in case with direct evidence of discrimination).

The problem with Benton's argument is that the evidence shows she was not denied training. Although Kachman did not let her travel to New Orleans for the in-person TechEd training conference, Bention does not dispute that she was offered the opportunity to choose online training courses as an alternative. The online training was from Microsoft, the same entity responsible for the TechEd conference. Benton has not

argued, and she has offered no evidence, that the online training Kachman offered her was in any way inferior to what she would have received had she traveled to New Orleans for TechEd. In short, Shinseki has offered undisputed evidence that the training that Kachman offered to Benton "was directly from Microsoft and would have been similar" to TechEd. Def.'s Ex. B at 24. What is important from an ADA/Rehabilitation Act perspective is what the training involved, not where it took place.

Benton's case does not resemble *Hoffman*, in which a one-handed employee was denied altogether the ability to train on a specific device because her employer thought she was incapable of operating it. See *Hoffman*, 256 F.3d at 570–71. Nor is it like *Shaner v. Synthes*, 204 F.3d 494, 503–04 (3d Cir. 2000), one of the few other appellate cases to address denial of job training in an ADA context. There, a supervisor would not allow an employee to receive training on Microsoft Excel because it was not germane to his job. *Id.*

Because Benton has not offered evidence from which a reasonable jury could find that she was actually denied training, her discrimination claim cannot proceed.

**2.     Hostile work environment claim**

In general, a plaintiff making a hostile environment claim under the ADA "must follow the methodology already established in the parallel area of Title VII litigation." *Silk v. City of Chicago*, 194 F.3d 788, 804 (7th Cir. 1999).[2] As applied here and in other disability cases, the test for hostile work environment has four parts: "(1) the plaintiff must be the object of unwelcome harassment; (2) the harassment must be based on

---

[2] The Seventh Circuit has "not decided whether allowing a hostile work environment is actionable under the ADA." *Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594, 603 (7th Cir. 2009). Shinseki has not argued, however, that Benton's claim is not legally viable on this basis, and thus he has forfeited that point for purposes of summary judgment.

disability; (3) it must be sufficiently severe and pervasive so as to alter the conditions of employment; and (4) there must be a basis for employer liability." *Bellino v. Peters*, 530 F.3d 543, 551 (7th Cir. 2008).

Benton contends that after Kachman denied her work-from-home accommodation request, his treatment of her changed in a way that made her work environment pervasively hostile, due to her disability. Benton identifies over a dozen instances of conduct on Kachman's part. *See* Pl.'s Mem. at 14-15. These instances can be grouped in several categories: the denial of Benton's more limited work-at-home request; criticism regarding absenteeism; enhanced scrutiny of her work; pushing or requiring her to work on her own without seeking assistance from Kachman or co-workers; the previously-referenced denial of attendance at the New Orleans training conference; and putting her on the performance improvement plan.

Benton concedes that no individual incident was severe but argues that together they satisfy the requirement of pervasiveness. The requirement of "severe or pervasive" conduct ""is disjunctive—'one extremely serious act of harassment could rise to an actionable level as could a series of less severe acts.'" *Hall v. City of Chicago*, 713 F.3d 325, 330 (7th Cir. 2013) (internal quotation marks omitted). "[C]onduct that is not particularly severe but that is an incessant part of the workplace environment may, in the end, be pervasive enough and corrosive enough that it meets the standard for liability." *Jackson v. Cnty. of Racine*, 474 F.3d 493, 499 (7th Cir. 2007). As the Seventh Circuit stated in *Silk*, "the whole can be greater than the sum of the parts, and . . . it is quite appropriate for a plaintiff to ask the trier of fact to draw an inference of discrimination from a pattern of behavior when each individual act might have an

11

innocent explanation."  *Silk*, 194 F.3d at 807.

Benton must show that Kachman's behavior was both offensive to her personally, and that the environment was one that "'a reasonable person would find hostile or abusive.'"  *Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1045 (7th Cir. 2002) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998)).  In assessing this, a court examines the totality of the circumstances, including the frequency and severity of the conduct in question, "whether it is physically threatening or humiliating or merely offensive, and whether it unreasonably interferes with an employee's work performance."  *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840 (7th Cir. 2009).  The bottom-line test is whether the conduct alleged "alter[ed] the conditions of the victim's employment."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).

The Court concludes that no reasonable jury could find that the actions alleged meet the objective, reasonable-person component of this standard.  Benton cites no case, nor is the Court aware of any, that indicates that enhanced scrutiny by a supervisor, even combined with criticism of job performance, can amount to an actionable hostile work environment.  Although the Court certainly can imagine a case in which a supervisor constantly rides herd on a particular employee such that her work environment becomes pervasively hostile, no reasonable jury could find this to be such a case.  The conduct that Benton cites did not pervade the workplace, nor was it incessant.  Rather, it amounted to a couple handfuls of incidents over a period of a number of months.  In addition, Benton has admitted that Kachman at times acted favorably toward her during the relevant period, which cuts against her claim of "pervasive" harassing conduct.  For example, though Kachman denied Benton's

requests to work from home, he did offer her the accommodation of a parking spot closer to her work building, which she turned down. Kachman also gave Benton a positive performance rating in April 2010, and he allowed her to miss early conference calls when she had to submit blood for testing. Finally, the performance improvement plan was not onerous, and there is no basis for an inference that it imposed upon Benton any new job duties or requirements.

In sum, the alleged adverse incidents that Benton cites were sporadic and were insufficiently severe to permit a reasonable jury to find that they altered the conditions of her employment. Though Benton herself plainly believed she was being harassed, a jury could not reasonably find that her claim meets the objective element of the test for a hostile work environment. Shinseki is therefore entitled to summary judgment on this claim as well.

## Conclusion

For the reasons stated above, the Court grants defendant's motion for summary judgment [docket no. 13] and directs the Clerk to enter judgment in favor of the defendant.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: October 11, 2013